**United States District Court**
**Eastern District of Michigan**
**Southern Division**

United States of America,

Plaintiff,

v.

D-1 Braylon Marshall,
D-3 Henry Ballard,

Defendant.
_______________________________/

Case No. 25-20869

Honorable Susan K. DeClercq

# Government's Response to Defendants' Motion to Suppress Evidence Stemming from October 4, 2024, Cell Towers Records Warrant (ECF No. 83, 87)

Defendants Braylon Marshall and Henry Ballard stole a pickup truck from ZJ's Custom Auto in Roseville and drove it to the Zeal Credit Union in Livonia where they used the truck to break into an ATM and steal $138,000. They now seek to suppress the location of the truck they stole on the way to the ATM theft, as well as the location of a neither man traveled in, along with geofence records directly tied to the two crime scenes.

But Marshall and Ballard had no reasonable expectation of privacy in the location of a stolen pickup, nor did they have any legitimate expectation of privacy in the location of a rental car they didn't rent or drive. And the search of the relevant area dump was supported by probable cause and limited by Attachment B to anonymous information for devices present in two of the three locations or whose location put the devices at the relevant crime scenes. Marshall's motion should be denied.[1]

## I. Factual Background

### a. Marshall and Ballard Steal a Truck and Break into the ATM at Zeal Credit Union

Marshall checked into a hotel in Farmington Hills on September 21, 2024, using his own name and credit card, and stayed until September 27, sharing a room with Ballard. (ECF No. 1, PageID.52 ¶14). On the night of September 26, into the early hours of September 27, Marshall and Ballard drove with D-2 Daryl Edwards to ZJ's Custom Auto Dealer in Roseville, Michigan, where Marshall and Ballard stole an F-

[1] Marshall filed the initial motion to suppress, in which Ballard later joined urging suppression of the evidence for the same reasons. (ECF No. 87).

350 pickup truck and placed a new plate on the truck (DFD0159). (*Id.* at ¶11) (ECF No. 83-1, PageID.566 ¶22).[2] The stolen F-350 was assisted by a Nissan Rogue rented by Edwards back in Houston, Texas, on September 24. (*Id.* at PageID.5 ¶12). Edwards rented the Nissan and drove up to Michigan separately from Marshall and Ballard.

The three men, along with a fourth unindicted co-conspirator, drove to the Zeal ATM, where Marshall pried off the front of the ATM with a crowbar, while Ballard hooked up chains from the ATM to the stolen truck, and together they tore out the drawers of cash inside the ATM, getting away with $138,000. (ECF No. 1 PageID.50 ¶¶ 8–9). Marshall and Ballard abandoned the stolen F-350 around the corner from the Zeal Credit Union and returned to the hotel in Edwards's rental car. (*Id.* at ¶ 10). The next day, Marshall, Ballard, and the other co-conspirators spent the stolen cash at a local mall on luxury items, shopping for hours at various high-end retailers. (*Id.* at PageID.54–55 ¶¶ 19–20).

---

[2] In ECF No. 83-1, the challenged area dump warrant, Ballard is referred to as "the subject" while Marshall is referred to as the "second subject."

**b. Law Enforcement Use Automatic License Plate Readers to Identify co-Defendant Darryl Edwards's Rental Car**

Livonia police responded to the Zeal ATM break in and found the stolen truck around the corner. Despite the stolen plate, the officers were able to identify the owner of the truck as ZJ's Custom Auto. (ECF No. 83-1, PageID.565 ¶20). An FBI task force officer (TFO) then went to ZJ's where he reviewed surveillance video of Marshall and co-defendants stealing the F-350. (*Id.* at ¶21). During that review, the TFO also noticed a silver SUV circling ZJ's, consistent with serving as a lookout. (*Id.*).

The TFO then searched the FLOCK automated license plate reader (ALPR) database for the stolen plate (DFD0159) and found that the plate had been spotted at Gratiot Avenue and 11 Mile at 1:02:21 am. (*Id.* at ¶22). The TFO then looked at additional license plate hits at that camera and learned that a silver Nissan with a Texas license plate had passed the camera just a few seconds after the truck. (*Id.*). The Texas plate was significant because the FBI had been investigating a "possible connected crew[] who traveled from Houston, Texas to the Detroit metro area" to break into ATMs. (*Id.* at PageID.561 ¶5).[3]

---

[3] In addition to the initial search used to obtain the October 4 warrant, an FBI analyst searched ALPRs from September 24 to







***ALPR Result for DFD0159 (top) and TVS 3639 (bottom)***

---

September 28, 2026, for the rented Nissan and found 25 results. (Gov. Exh. 1 – FBI Report Serial 4) (Gov. Exh. 2 – Intiial ALPR FBI Results). The TFO conducted a search for a larger date range and found 146 results from August 19, 2024 to September 27, 2024. (Gov. Exh. 3 – Subsequent ALPR Results).

The TFO used the ALPR hits to get a search warrant for area dump[4] information from three locations: 1) the ATM robbery at the Zeal Credit Union; 2) the truck robbery from ZJ's in Roseville; and 3) the ALPR hit at 11 Mile Road and Gratiot Avenue. (ECF No. 83-1, PageID.568). The time frame for the search was 20 minutes for the first two locations and five minutes for the intersection. For each location, the Attachment A specified that the search would include a circle with a radius of .40 miles.[5] (*Id.* at PageID.575).

Attachment B ordered T-Mobile to conduct a search of its own records and to provide device information, such as IMSI numbers, for devices present within the geofence areas as well as related call

---

[4] Unlike a traditional tower dump warrant, which includes information on all of the devices connecting to a certain town, an area dump provides information for devices that are believed to be present within a certain geographic area, a geofence, based on the device's tower connections and timing advanced data. *See* (ECF No. 83-1, PageID.569–72). While an area dump warrant is similar to a geofence warrant, the information about the devices is generally less accurate that geofence warrants based on Google's more comprehensive records. *See Chatrie v. United States*, 146 S.Ct. 2193, 2200 (2026) (noting Google's "Location History" uses a variety of sources to "determine a cell phone's location within 20 meters").

[5] Because the confidence interval for cell tower data is less accurate than Google location history information, a radius of .4 is necessary to confidently capture any devices at the specific GPS coordinates.

metadata. (*Id.* at PageID.576, ¶ 1). It also specified that any subscriber information be sought through additional legal process. (*Id.* at PageID.557 ¶4). Attachment B further explained that the additional identifying information would be requested for devices that were present at two of the three locations or whose location information was consistent with being present at the thefts not merely passing through. (*Id.* at ¶ 3). Finally, Attachment B specified that law enforcement could not make "investigative use" of information related to devices not relevant to the current investigation. (*Id.* at PageID.577–78 ¶5).

The Magistrate Judge signed the warrant on October 4, 2024. (*Id.* at PageID.55). Using the tower returns, FBI agents were able to identify only three devices that met the criteria of being present at both the ZJ's Custom Auto and the Zeal Credit Union theft—the three devices linked to the three co-defendants.[6] The FBI obtained a search warrant for the subscriber information and historical location data for two of the three devices, D-1 Marshall's phone and D-3 Ballard's phone.[7] (ECF No. 87,

[6] The data return did not place these devices at the ALPR hit, location 3.

[7] Separately, the FBI identified one of these numbers as belonging to D-2 Edwards because the Edwards used the number to rent the Nissan in Texas and obtained a separate warrant for that devices location data.

PageID.672–95). Using that data from those subsequent warrants, the FBI was able to map the data against the relevant events in the case and prepare a report implicating the defendants. Below is a sample slide from the report.




***Cell Site Location Information Mapped against Vehicle Theft***

Marshall and Ballard now move to suppress the evidence obtained from the October 4, 2024, Area Dump Warrant arguing that: 1) the ALPR information was a warrantless search which should be struck from the warrant and which, as a result, removes all probable cause from the warrant; and, alternatively, 2) the October 4 warrant lacked particularity and the data should be suppressed.

## II. Legal Standard

The Fourth Amendment establishes the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. In moving to suppress evidence, the defendant bears "the burdens of production and persuasion." *United States v. Chaar*, 137 F.3d 359, 363 (6th Cir. 1998).

To establish a violation of the Fourth Amendment, a defendant must show a violation of a "reasonable expectation of privacy"—i.e., "an actual (subjective) expectation of privacy . . . that society is prepared to recognize as reasonable." *Katz v. United State*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). In determining whether a reasonable expectation of privacy exits, court are guided by the purpose of the Amendment: "to secure the privacies of life" and prevent government access to citizens "most closely kept aspects of their lives." *Chatrie v. United States*, 146 S.Ct. 2193, 2205 (2026).

Warrants must describe with particularly "the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This requirement "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging

exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). But the "critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *See Zurcher v. Stanford Daily*, 436 U.S. 547, 560 (1978).

Finally, even where a warrant fails to describe the place to be searched with sufficient particularity, federal courts will not apply the exclusionary rule to evidence obtained when law enforcement "acted in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate." *Massachusetts v. Sheppard*, 468 U.S. 981, 987–88 (1984).

This good-faith exception to the exclusionary rule applies to warrants lacking in particularity unless the warrant is "so facially deficient" that officers could not have reasonably relied on it. *United States v. Watson*, 498 F.3d 429, 432 (6th Cir. 2007) (refusing to suppress evidence and applying good-faith exception to warrant that failed to describe the area to be searched at all). The court can proceed directly to

the good-faith exception and deny a motion to suppress on that basis alone. *Id.* at 431.

## III. Argument

Marshall and Ballard move to suppress the evidence obtained from the October 4 Area Dump Warrant under two theories. First, they argue that the ALPR data described in paragraph 22 and 23 of the warrant was illegally obtained without a search warrant. And if those two paragraphs are struck, the warrant would lack probable cause. Second, the warrant lacked particularity because it sought information across too wide a geographic area, collecting records about devices that were not involved in the underlying ATM theft.

Marshall and Ballard's first argument fails out of the gate because they lack Fourth Amendment standing[8] to challenge the ALPR search. Marshall and Ballard cannot have a legitimate expectation of privacy in

[8] Fourth Amendment standing is a term of art that refers to a substantive reasonable expectation of privacy in the place searched and is not synonymous with the jurisdictional concept of standing. *Byrd v. United States*, 584 U.S. 395, 410 (2018). Although the government believes it is appropriate to begin with Marshall and Ballard's expectation of privacy, the Court is not required to begin there since the concept is not jurisdictional. The government refers to "standing" when appropriate as a shorthand for the concept of a reasonable expectation of privacy.

the location of a stolen truck and a car someone else rented. *See United States v. Yang*, 958 F.3d 851, 858–59 (9th Cir. 2020) (finding defendant lack expectation of privacy necessary to challenge ALPR search where he continued to possess a rental car after the lease expired). But even if he could overcome this fundamental defect, courts have almost uniformly rejected Marshall's argument.[9] As the leading Circuit Court opinion on

---

[9] Marshall artfully avoids discussing the overwhelming precedent against him by limiting his discussion of the case law to Sixth Circuit cases. (ECF No. 83, PageID.531) ("Counsel is aware of no 6th Circuit case that discusses this extremely important issue.") But precedent from outside the Sixth Circuit is unanimously against his position with one recent exception. *United States v. Lawrence*, 22-69, 2026 WL 765307, at *1 (D.N.D. March 18, 2026); *United States v. Floyd,* 811 F. Supp. 3d 1345, 1345–50 (M.D. Fla. 2025); *Schemel v. City of Marco Island Fla.*, 22-79, 2025 WL 2958798, at *2 (M.D. Fla. Oct. 17, 2025), *appeal docketed*, No. 25-13913 (11th Cir.); *Rinaldi v. Sylvester*, 2025 WL 2682691, at *16–18 (S.D.N.Y. Sept. 19, 2025); *United States v. Brown*, 25-188, 2025 WL 2444596, at *3–5 (W.D. Okla. Aug. 25, 2025); *United States v. Acosta*, 25-239, 2025 WL 2427700, at *4–6 (N.D. Okla. Aug. 22, 2025); *United States v. Sturdivant*, 786 F. Supp. 3d 1098, 1107-14 (N.D. Ohio 2025), *appeal docketed*, No. 26-3426 (6th Cir.); *United States v. Jackson*, 24-10010, 2025 WL 1530574, at *5–10 (D. Kan. May 29, 2025); *United States v. Griffin*, 24-190, 2025 WL 1474679, at *8–9 (S.D. Ind. May 22, 2025); *Scholl v. Illinois State Police*, 776 F. Supp. 3d 701, 713–21 (N.D. Ill. 2025); *United States v. Cooper*, 23-131, 2025 WL 35035, at *4–7 (E.D. La. Jan. 6, 2025); *United States v. Martin*, 753 F. Supp. 3d 454, 468–76 (E.D. Va. 2024); *United States v. Salcido-Gonzalez*, 23-49, 2024 WL 2305478, at *11–12 (D. Utah May 21, 2024); *United States v. Jiles*, 23-98, 2024 WL 891956, at *16–19 (D. Neb. Feb. 29, 2024); *United States v. Toombs*, 671 F. Supp. 3d 1329, 1339–42 (N.D. Ala. 2023); *United States v. James*, 21-176, 2023 WL 3370421, at *4–6 (W.D. La. Jan. 30, 2023); *United States v. Graham*,

this issue held, ALPR queries do "not constitute a search, so no warrant [is] required." *United States v. Porter*, 170 F.4th 381, 386 (5th Cir. 2026).

Marshall's second argument also comes up short. The October 4 warrant describes with particularity the geographic places to be searched and the duration of the search based on the specific allegations in the warrant and limited the data to be seized to device information, not subscriber information. Marshall's motion should be denied.

**a. Marshall and Ballard had no reasonable expectation of privacy in their movements on public streets in a stolen truck.**

Marshall and Ballard maintain that the FBI's use of ALPRs to identify the locations of the stolen truck and the rental car following close behind it was a search, which required a warrant. That is wrong for two reasons, one specific and one general. Specifically, Marshall and Ballard had no legitimate expectation of privacy in stolen property. And, more

---

21-645, 2022 WL 4132488, at *4–5 (D.N.J. Sept. 12, 2022); *United States v. Porter,* 21-87, 2022 WL 124563, at *2–3 (N.D. Ill. Jan. 13, 2022); *United States v. Brown*, 19-949, 2021 WL 4963602, at *1–4 (N.D. Ill. Oct. 26, 2021); *United States v. Bowers*, 18-292, 2021 WL 4775977, at *2–5 (W.D. Pa. Oct. 11, 2021); *United States v. Rubin*, 556 F. Supp. 3d 1123, 1127–30 (N.D. Cal. 2021); *but see United States v. Kyle*, __ F.Supp.3d___, 26-189, 2026 WL 2958728 (N.D. Okla. Oct. 1, 2026).

generally, it is well-established that there is no legitimate expectation of privacy in movements solely on public roads.

1. **The Court does not need to reach the issue of whether ALPRs are searches in general because Marshall and Ballard had no legitimate expectation of privacy in the movements of a stolen truck and a rental car they did not rent.**

To challenge a search warrant, a defendant must have his own legal right and interest in the place searched and cannot assert the rights of third parties. *Rakas v. Illinois*, 439 U.S. 128, 139–40 (1978). This means that a person present in a stolen car cannot object to the lawfulness of the search of that car any more than a burglar can challenge the search of a home he broke into. *Id.* at 141 n.9; *see also Byrd*, 548 U.S. at 409.

Marshall and Ballard ask the Court to strike paragraph 22 of the October 4 warrant because it describes a supposedly unconstitutional search. But Marshall and Ballard do not dispute that the truck was stolen (and its license plate replaced) nor do they assert any personal interest in the truck. Thus, even if the FBI impermissibly searched for the truck's stolen plate without a warrant, Marshall and Ballard had no reasonable expectation of privacy in that stolen truck with a stolen plate.

Nor do Marshall and Ballard have a reasonable expectation of privacy in the ALPR query of the rented Nissan. D-2 Edwards rented the Nissan, drove it up from Houston, and drove it during the thefts. Marshall and Ballard were only briefly in the Nissan as passengers on the way to and from the thefts. Marshall and Ballard thus had "no ownership or possessory interest in" the Nissan because they weren't driving, and "the car belonged to" Edwards (for the duration of the rental). *United States v. Russell*, 26 F.4th 371, 377 (6th Cir. 2022). And Marshall and Ballard had no "privacy interest in the car" as a short-term passenger. *Id.* So, they had no interest in the car at all, never mind "one that society is prepared to recognize as 'reasonable.'" *Rakas*, 439 U.S. at 143 n.12.

Marshall and Ballard have failed to carry "the burden of establishing standing." *Russell*, 26 F.4th at 377. The Court can deny Marshall's motion on that narrow ground alone, without address the broader question of whether ALPR searches ever require warrants. *See Yang*, 958 F.3d at 861.

**2. Even if the Court finds Marshall and Ballard had a reasonable expectation of privacy in the stolen truck and rented Nissan, ALPR queries as not searches because they only reveal images of cars taken in plain view.** [10]

If the Court finds that Marshall and Ballard have Fourth Amendment standing, it should still deny their motion because ALPR photos and queries are not a search. Two strands of Fourth Amendment precedent show why: vehicle surveillance and pole cameras.

As to vehicle surveillance, the Supreme Court has explained, a "person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *United States v. Knotts*, 460 U.S. 276, 281 (1983). This is because the traveler "voluntarily" reveals his location to "anyone who want[s] to look." *Id.* at 281–82. Consistent with this precedent, the Sixth Circuit has held that "a motorist has no reasonable expectation of privacy in the information contained on his license plate." *United States v. Ellison*, 462 F.3d 557, 561 (6th Cir. 2006). License plates are not

[10] The Sixth Circuit is currently considering the issue of whether ALPR queries are a search. *See Sturdivant*, Case No. 26-3426. The appellee's brief is due on November 18, 2026. The Court may wish to hold its ruling in abeyance pending the outcome of *Sturdivant* if it finds Marshall and Ballard have a reasonable expectation of privacy in the challenged searches.

private—in fact, the "purpose of a license plate . . . is to provide identifying information to law enforcement officials and others." *Id.*; *see* Mich. Comp. Laws Ann. § 257.255.[11] *Ellison* also made clear that the "entry of" a license plate "into a law-enforcement computer database" does not change the Fourth Amendment analysis. Ellison, 462 F.3d at 562.

ALPR searches fall squarely within *Knott*'s and *Ellison*'s reasoning. All that the ALPR cameras would have revealed about Marshall and Ballard's location is that they were "travelling over particular roads in a particular direction," any "stops [they] made," and their "final destination when [they] exited from public roads onto private property." *Knotts*, 460 U.S. at 276, 281. The Supreme Court has already said that Marshall and Ballard have no "reasonable expectation of privacy" in that information.

---

[11] Marshall tries to reframe *Ellison* as a case about a license plate search based on the fact that the driver was "arguably acting suspicious." (ECF No. 83, PageID.529). But in *Ellison*, the government specifically disavowed any argument that the stop was based on probable cause of a traffic violation and argued only that there was no legitimate expectation of privacy in a license plate number. Thus, the holding of *Ellison* is that no level of suspicion is required to run a license plate search. Notably, the only support Marshall has for his reading of *Ellison* is the dissent, which would have required a showing of some suspicion before performing the query.

And, as *Ellison* held, law enforcement's use of a database does not create a privacy interest. Marshall does not explain "how using a license plate number—in which there is no expectation of privacy—to retrieve other non-private information somehow creates a 'search' for the purposes of the Fourth Amendment." *Ellison*, 462 F.3d at 562.

The Sixth Circuit's pole-camera precedent confirms this conclusion. The Sixth Circuit has said that the warrantless use of pole cameras does not violate the Fourth Amendment. *United States v. Houston*, 813 F.3d 282, 285 (6th Cir. 2016). The constitutional principle is the same: a person has no reasonable expectation of privacy in "views that were plainly visible to any member of the public." *Id.* at 288; *see also California v. Ciraolo*, 476 U.S. 207, 213 (1986). And while ALPR system's data-analysis function helps law enforcement sort through the many photos ALPRs capture, "the Fourth Amendment does not punish law enforcement for using technology to more efficiently conduct their investigations." *Houston*, 813 F.3d at 288.

Nonetheless, Marshall and Ballard argue that a query of ALPRs is a search because the database of license plate hits provides not just real-time information about where something is located but also historical

information akin to the cell-site location information (CSLI) and geofence warrants at issue in *Chatrie* and *Carpenter*. But Marshall and Ballard ignore the significant differences between cell phones and cars.

While APLR databases are like the searches in *Chatrie* and *Carpenter* in that they allow remote monitoring of historical data that would not have been available in the past, they do not provide anything like the comprehensive, personal location information stretching "*beyond public thoroughfares* and into private residences, doctor's offices, and political headquarters" at issue in *Carpenter* and *Chatrie*. 146 S.Ct. at 2211 (emphasis added). ALPRs are specifically limited to "public throughfares."

And unlike cell phone location data, ALPRs only identify license plates and some generic features of a car on public roads at specific camera locations. And they only store information about the plate at isolated intervals—they do not provide anything like the comprehensive location information a cell phone provides. Plus, unlike cell phones, people regularly share automobiles within a household or lend them to family or friends for longer periods of time.

The Supreme Court has consistently recognized this distinction between cell phones and cars. *Riley v. California* highlighted that the "reduced expectation of privacy" in vehicles does not apply to "cell phones searches." 573 U.S. 373, 398 (2014). And *Carpenter* explained that "unlike" a "car," a "cell phone" is "almost a feature of human anatomy" that "tracks nearly exactly the movements of its owner." 585 U.S. at 311 (citation modified). And *Chatrie* distinguished *Knotts* on the ground that a "car is always in plain view," while a cell phone's location history "reveals" movements that "are not limited to public streets." 146 S. Ct. at 2211. ALPRs do not raise the cell-phone specific privacy concerns the Court handled in those cases.

In fact, *Chatrie* undermines Marshall and Ballard's arguments that ALPR queries are searches. Marshall and Ballard would likely concede that a single license plate photo of a vehicle on a public road is a search. *See* (ECF No. 83, PageID.528–29). Their concern is more with aggregation of data to investigate criminals. *Id.* at PageID.527. And before *Chatrie*, that argument was colorable. Some courts held that a warrantless ALPR query was okay because the it returned only minimal information. *United States v. Rubin*, 556 F. Supp. 3d 1123, 1130 (N.D.

Cal. 2021). But if the query produced "significantly more detailed information," the calculus might change. *Id.*

*Chatrie* rejected this "mosaic" theory of the Fourth Amendment. In short, the mosaic theory is the idea that "the government's collection of numerous discrete data points over time can create an impermissibly invasive picture of an individual's private life, even if any individual data point, standing alone, would not constitute a search." *United States v. Green*, 149 F.4th 733, 746 (D.C. Cir. 2025). But *Chatrie* rejected the distinction between short-term and long-term monitoring. 146 S. Ct. at 2209–10. The Fourth Amendment does not "kick[] in only once and intrusion goes too far." *Id.* at 2210. When "the Fourth Amendment applies, it applies—regardless of the quality or quantity of information the government obtains." *Id.* (citation modified).

The Court's rejection of the mosaic theory dooms Marshall and Ballard's challenge. If a single ALPR photo is not a search—and *Knotts*, *Ellison*, and *Hudson* show that it is not—then piecing multiple photos together does not transform it into one. A "search is a search," and taking a photograph of a car on a public road is not a search. *Arizona v. Hicks*, 480 U.S. 321, 325 (1987).

But even if the Court believes Marshall and Ballard had a reasonable expectation of privacy in the ALPR records and the query was a search, the good-faith exception to the exclusionary rule applies. The Supreme Court has explained that the exclusionary rule for Fourth Amendment violations applies as a "last resort" where the benefit of deterring future violations outweighs the "heavy costs" of suppressing the truth and allowing criminals to run free *See Davis v. United States*, 564 U.S. 229, 237 (2011). "[E]vidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Illinois v. Krull*, 480 U.S. 340, 348–49 (1987).

There is no evidence that the FBI investigators here had any knowledge that their ALPR query was unconstitutional. And, as a result, suppression here would do little to deter future violations. In October of 2024, there was no case law suggesting that querying an ALRP database required a search warrant and no precedent for asking a Magistrate Judge for such a warrant. As discussed above, Sixth Circuit case law had held that individuals had no expectation of privacy in their license plate numbers, and the Supreme Court had held location information

implicated the Fourth Amendment only went it placed the target beyond public thoroughfares. While the government does not believe anything in the Supreme Court's decision in *Chatrie* changes the analysis, even if it did, that decision was still more than a year and a half away.

In sum, there is no indication law enforcement was not acting on a reasonable, good-faith belief that APLR queries did not require a warrant. Suppressing the evidence in this case would have no future deterrent benefit, therefore. *See United States v. McLamb*, 880 F.3d 685, 691 (4th Cir. 2018) (declining to suppress evidence where the legality of the search technique was unclear).

**b. The October 4 Geofence Warrant described the place to be searched and the evidence to be seized with sufficient particularity.**

Marshall further challenges the October 4 Area Dump Warrant for lacking particularity in describing the place to be searched and the things to be seized, arguing that the warrant authorized the collection of excessive location information and did not provide guidance to the officers as to how to execute the search.[12] (ECF No. 81, PageID.536–42).

[12] The Sixth Circuit is currently considering whether search warrants are required for tower warrants. *United States v. Williams*, 25-1149 (6th Cir.) Because the government got a warrant in this case, there

The degree of particularity required in a warrant is "flexible and will vary depending on the crime involved and the types of items sought." *United States v. Greene*, 250 F.3d 471, 477 (6th Cir. 2001). A warrant is valid it is "as specific as the circumstances and the nature of the activity under investigation permit." *Id.* Federal courts have generally avoided rigid protocols for searches and seizures of electronic data, taking a practical approach to such warrants instead. *See United States v. Richards*, 659 F.3d 527, 539–40 (6th Cir. 2011). The "critical issue" is always simply whether "there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher*, 436 U.S. at 560.

Attachment B of the October 4 Warrant authorizes the seizure of identifying numbers, such as IMSI numbers, for the devices found in the areas specified in Attachment A and metadata related to calls. But it specifically forbids the collection of "subscriber information (including but not limited to name or phone number associated with the identifiers) or location information outside the initial search criteria [] authorized by

---

is no need to reach the issue here of whether the tower warrant is a search. The government will assume for purposes of this response that a warrant was required.

this warrant." (*Id.* at 577 ¶4). The warrant also explains that law enforcement will submit further legal process before getting any subscriber information. (*Id.*).[13]

In addition, the warrant is specific that the agents will only seek additional information for devices that are present at two of the three locations or whose latitude and longitude at the time of the thefts make them relevant to the investigation and not devices that are solely passing through. (*Id.* at ¶3(a)). And that the government will not make "investigative use . . . absent further order of the court" of devices not relevant to this investigation." (*Id.* at ¶5).

1. **The October 4 warrant limited the search to three precise geographic areas and a timeframe tied to the probable cause established in the affidavit.**

The October 4 warrant here included three specific limitations, described above, that limited the scope of the search: 1) Attachment A limited the geographic and temporal area of the search; 2) Attachement

---

[13] And FBI agents did later submit search warrants for the two new IMSI numbers identified in the returns as present at the Zeal Credit Union and ZJ's Custom Auto and associated them with D-1 Marshall and D-3 Ballard. (ECF No. 87, PageID.673–91). Separately, FBI got a warrant for D-2 Edwards's two numbers, one of which was present at the two thefts.

B limited the seized records to devices present at the thefts or two of the three locations; and 3) Attachment B prohibited the FBI from seeking identifying information for any of the devices except by legal process. Such "geographic and durational" limitations are the core of the particularity requirement and distinguish valid warrants from the general warrants the Fourth Amendment forbids. *See United States v. James*, 3 F.4th 1102, 1106 (8th Cir. 2021) (affirming denial of motion to suppress warrant that sought 90 minutes worth of data for five robberies). [14]

First, as to the geographic and durational limits, while they certainly allowed for the collection of a large amount of data, the limits were tied to the specific probable cause in the affidavit and were no larger

---

[14] *See also United States v. Savage*, 23-454, 2024 WL 3295586 at * 2–3 (E.D. Penn.); *In re Tower Dump Data for Sex Trafficking Investigation*, 2023 WL 1779775 at *4–6 (N.D. Ill.); (noting that search protocols properly limited the scope of a warrant); *In re Information Associated with Cellular Telephone Towers*, 616 F. Supp. 3d 1, 10–11 (D.D.C. 2022) (Howell, J.); *Hudson v. Delaware*, 312 A.3d 615, 633–634 (Del. 2024) (finding cell tower warrants for five sites for no more than two hours did not lack particularity); *Commonwealth v. Perry*¸184 N.E. 3d 745, 767–69 (Ma. 2022); *but see United States v. Smith*, 110 F.4th 817 (5th Cir. 2024) (finding the type of geofence warrant at issue in *Chatrie* unconstitutional but refusing to suppress evidence); *In re Four Applications for Search Warrants*, 25-38, 2026 WL 2260371 at *11 (S.D. Miss.) (finding tower dumps "*per se*" unconstitutional general warrants).

than necessary. Attachment A describes the three areas to be searched by their latitude and longitude, including a circle four tenths of a mile in radius around those locations, based on the locations of the Zeal theft, the truck theft, and the ALPR hit set out in the affidavit. (ECF No. 83-1, PageID.575). The times for the area searches were based on the video surveillance of the actual thefts and the LPR hits. *See* (*Id.* at PageID.565 ¶18, 566–67 ¶¶21, 22). Notably, the timeframes for the two thefts were longer than the time frame for the ALPR hit. Thus, the scope of the information sought was properly tied to the probable cause established in the warrant.

Marshall and Ballard complain that this search would necessarily include devices not involved in any of the thefts. But it is well established that law enforcement can seize and examine non-responsive documents when executing a search warrant to determine which documents are responsive. *See Richards*, 659 F.3d at 539; *United States v. Bass*, 785 F.3d 1043, 1049–50 (6th Cir. 2015). In the context of digital investigations, and consistent with pre-digital case law, courts have approved for seizing large amounts of non-responsive data as long as the warrant provides criteria from distinguishing responsive and non-responsive information.

*See, e.g.*, *United States v. Palms*, 21 F.4th 689, 697–98 (10th Cir. 2021). And even in paper cases, "it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976).

And it is not unusual that searches will implicate the privacy rights of others such as spouses sharing a house that is searched, or innocent third parties who send messages, whether emails, texts, or old-fashioned letters, to people involved in criminal activity. The fact that an otherwise valid warrant implicates the privacy interests of third parties is not a reason to deny the warrant. *See Zurcher*, 436 U.S. at 560 (rejecting argument that the owner of property must be implicated in wrongdoing in order to authorize a search of the property); *in re Arson Investigation*, 497 F. Supp. 3d 345, 361 (N.D. Ill. 2020).

In addition, Marshall and Ballard overstate the privacy interest at stake as to the devices that happened to be present at the three locations. While cell tower information can be useful in placing a subject in a banded area, it does not provide the detailed, precise location information like the data at issue in *Chatrie*, which drew on a number of sources to

store a cell phone's location, including "nearby Wi-Fi networks, Bluetooth beacons, and cell sites, as well as GPS and IP address information" to place a device in a particular location within 20 meters. 146 S.Ct. at 2200. Similarly, while with additional process law enforcement can learn valuable information about the device such as the named subscriber, without actual user attribution data from the device, it requires an additional inference to find that a named subscriber was the user of the device at the relevant time. And many devices do not have named subscribers, or the named subscriber is not the actual user, as was the case here where both Marshall and Ballard's devices had subscribers other than the user.

Second, Attachment B limits the information to be seized to anonymous numbers associated with the devices present akin to serial numbers. Courts that have addressed particularity challenges to tower dumps have often upheld the warrants based in part on the more limited privacy interest users have in anonymized identifiers. And the fact that execution of a search warrant may impact the privacy rights of others uninvolved in the crime has never been a reason to prohibit the search. *See United States v. Church*, 823 F.3d 351, 355 (6th Cir. 2016) ("Search

warrants are not directed at persons; they authorize the search of 'places' and the seizure of 'things,' and as a constitutional matter they need not even name the person from whom the things will be seized.").

Third, the warrant required additional legal process before getting any additional information about the devices present at the locations described in Attachment A. This distinguishes the warrant from the warrant in *Chatrie*. While the Supreme Court took no position on whether that warrant was valid—and the government believes it was—the warrant in *Chatrie* was unique in that it arguably authorized the disclosure of identifying information with any additional legal process. *See United States v. Chatrie*, 136 F.4th 100, 158 (4th Cir. 2025) (describing the three-step process for obtaining identifying information). The warrant here specifically forbid obtaining identifying information without further process. [15]

---

[15] Justice Jackson's concurrence in *Chatrie* explains that she "would have gone further" and invalidated the warrant at issue in that case. But notably, Justice Jackson's concurrence only complains about the "uncommon, multi-step process" used in that warrant that allowed law enforcement to pursue data outside of the geofence and to seek subscriber information without additional process not the original step one geofence search. *Chatrie*, 146 S.Ct. at 2217 (Jackson, J., concurring). The October 4 Area Dump Warrant did the opposite, limiting the search to

Finally, the October 4 warrant was a command to a private company, T-mobile, to search its records for responsive data. It did not authorize the government to rummage through T-Mobile's records—the principal evil forbidden by the Fourth Amendment. The Supreme Court has made clear that judicial officials and government agents "must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy." *Andressen*, 427 U.S. at 482 n.11. But it has never forbidden warrants for places where there is probable cause to believe evidence of a crime is to be found.

**2. The Court can begin with the good-faith exception and find that the exclusion of evidence is not warranted where officers executed a facially valid warrant, signed by a neutral magistrate, and where no courts at the time had declared the area dump warrant unlawful.**

Finally, the good-faith exception to the warrant requirement applies even if the Court believes that warrant was unconstitutional. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently

---

information within the geofence and forbidding subscriber information without further legal process.

culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009).

As described above, the Court can begin its analysis with the good-faith exception. Warrants issued and signed by neutral magistrates are presumptively lawful and evidence obtained via such warrants will not be suppressed absent evidence that the warrant was "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *United States v. Leon*, 468 U.S. 897, 923 (1984).

The warrant here, however, described the property to be searched with GPS coordinates and specific geographic and temporal limitations. It put in place a specific protocol for determining evidence to be seized and placed limitations on additional law enforcement procedures. It did not allow government officials to rummage through records but instead ordered private individuals to produce records.

And all of this was done in a novel legal context where Marshall and Ballard admit there was no precedent forbidding the agents' actions. Given the substantial efforts of law enforcement to target their search to specific places and time and the efforts to protect user information,

suppressing the evidence here would serve none of the important values the exclusionary rule is meant to vindicate—it would not incentivize law enforcement to seek warrants in the future and would in fact disincentivize seeking warrants since it would provide no protection after the fact from suppression. *See Smith*, 110 F.4th at 838–40 (refusing to suppress evidence from geofence warrant under the good-faith exception).

## IV. Conclusion

For these reasons, the defendants' motion to suppress evidence stemming from October 4, 2024, Area Dump Warrant should be denied. (ECF No. 83, 87).

Respectfully Submitted,

JEROME F. GORGON, JR.
United States Attorney

s/*Stephen Carr*
Stephen Carr
Andrew R. Picek
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
Phone: 313-226-9721
E-mail: Stephen.carr@usdoj.gov

Dated: October 7, 2026

## Certificate of Service

I certify that on October 7, 2026, I submitted this document using the using the Court's electronic case filing system.

s/ Stephen Carr
Assistant U.S. Attorney
U.S. Attorney's Office